Justice KAGAN delivered the opinion of the Court.
The Social Security Administration (SSA) provides benefits to individuals who cannot obtain work because of a physical or mental disability. To determine whether *1152 an applicant is entitled to benefits, the agency may hold an informal hearing examining (among other things) the kind and number of jobs available for someone with the applicant's disability and other characteristics. The agency's factual findings on that score are "conclusive" in judicial review of the benefits decision so long as they are supported by "substantial evidence." 42 U.S.C. § 405(g).
This case arises from the SSA's reliance on an expert's testimony about the availability of certain jobs in the economy. The expert largely based her opinion on private market-survey data. The question presented is whether her refusal to provide that data upon the applicant's request categorically precludes her testimony from counting as "substantial evidence." We hold it does not.
I
Petitioner Michael Biestek once worked as a carpenter and general laborer on construction sites. But he stopped working after he developed degenerative disc disease, Hepatitis C, and depression. He then applied for social security disability benefits, claiming eligibility as of October 2009.
After some preliminary proceedings, the SSA assigned an Administrative Law Judge (ALJ) to hold a hearing on Biestek's application. Those hearings, as described in the Social Security Act, 49 Stat. 620, as amended, 42 U.S.C. § 301 et seq. , are recognizably adjudicative in nature. The ALJ may "receive evidence" and "examine witnesses" about the contested issues in a case. §§ 405(b)(1), 1383(c) (1)(A). But many of the rules governing such hearings are less rigid than those a court would follow. See Richardson v. Perales , 402 U.S. 389, 400-401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). An ALJ is to conduct a disability hearing in "an informal, non-adversarial manner." 20 CFR § 404.900(b) (2018) ; § 416.1400(b). Most notably, an ALJ may receive evidence in a disability hearing that "would not be admissible in court." §§ 404.950(c), 416.1450(c); see 42 U.S.C. §§ 405(b) (1), 1383(c)(1)(A).
To rule on Biestek's application, the ALJ had to determine whether the former construction laborer could successfully transition to less physically demanding work. That required exploring two issues. The ALJ needed to identify the types of jobs Biestek could perform notwithstanding his disabilities. See 20 CFR §§ 404.1560(c)(1), 416.960(c)(1). And the ALJ needed to ascertain whether those kinds of jobs "exist[ed] in significant numbers in the national economy." §§ 404.1560(c)(1), 416.960(c)(1) ; see §§ 404.1566, 416.966.
For guidance on such questions, ALJs often seek the views of "vocational experts." See §§ 404.1566(e), 416.966(e); SSA, Hearings, Appeals, and Litigation Law Manual I-2-5-50 (Aug. 29, 2014). Those experts are professionals under contract with SSA to provide impartial testimony in agency proceedings. See id. , at I-2-1-31.B.1 (June 16, 2016); id. , at I-2-5-48. They must have "expertise" and "current knowledge" of "[w]orking conditions and physical demands of various" jobs; "[k]nowledge of the existence and numbers of [those jobs] in the national economy"; and "[i]nvolvement in or knowledge of placing adult workers[ ] with disabilities[ ] into jobs." Id. , at I-2-1-31.B.1. Many vocational experts simultaneously work in the private sector locating employment for persons with disabilities. See C. Kubitschek & J. Dubin, Social Security Disability Law & Procedure in Federal Court § 3:89 (2019). When offering testimony, the experts may invoke not only publicly available sources but also "information obtained directly from employers" and data *1153 otherwise developed from their own "experience in job placement or career counseling." Social Security Ruling, SSR 00-4p, 65 Fed. Reg. 75760 (2000).
At Biestek's hearing, the ALJ asked a vocational expert named Erin O'Callaghan to identify a sampling of "sedentary" jobs that a person with Biestek's disabilities, education, and job history could perform. Tr. 59 (July 21, 2015); see 20 CFR §§ 404.1567(a), 416.967(a) (defining a "sedentary" job as one that "involves sitting" and requires "lifting no more than 10 pounds"). O'Callaghan had served as a vocational expert in SSA proceedings for five years; she also had more than ten years' experience counseling people with disabilities about employment opportunities. See Stachowiak v. Commissioner of Social Security , 2013 WL 593825, *1 (E.D. Mich., Jan. 11, 2013) ; Record in No. 16-10422 (ED Mich.), Doc. 17-13, p. 1274 (resume). In response to the ALJ's query, O'Callaghan listed sedentary jobs "such as a bench assembler [or] sorter" that did not require many skills. Tr. 58-59. And she further testified that 240,000 bench assembler jobs and 120,000 sorter jobs existed in the national economy. See ibid.
On cross-examination, Biestek's attorney asked O'Callaghan "where [she was] getting those [numbers] from." Id. , at 71. O'Callaghan replied that they came from the Bureau of Labor Statistics and her "own individual labor market surveys." Ibid. The lawyer then requested that O'Callaghan turn over the private surveys so he could review them. Ibid. O'Callaghan responded that she wished to keep the surveys confidential because they were "part of [her] client files." Id ., at 72. The lawyer suggested that O'Callaghan could "take the clients' names out." Ibid. But at that point the ALJ interjected that he "would not require" O'Callaghan to produce the files in any form. Ibid. Biestek's counsel asked no further questions about the basis for O'Callaghan's assembler and sorter numbers.
After the hearing concluded, the ALJ issued a decision granting Biestek's application in part and denying it in part. According to the ALJ, Biestek was entitled to benefits beginning in May 2013, when his advancing age (he turned fifty that month) adversely affected his ability to find employment. See App. to Pet. for Cert. 19a, 112a-113a. But before that time, the ALJ held, Biestek's disabilities should not have prevented a "successful adjustment to other work." Id. , at 110a-112a. The ALJ based that conclusion on O'Callaghan's testimony about the availability in the economy of "sedentary unskilled occupations such as bench assembler [or] sorter."Id. , at 111a (emphasis deleted).
Biestek sought review in federal court of the ALJ's denial of benefits for the period between October 2009 and May 2013. On judicial review, an ALJ's factual findings-such as the determination that Biestek could have found sedentary work-"shall be conclusive" if supported by "substantial evidence." 42 U.S.C. § 405(g) ; see supra , at 1151. Biestek contended that O'Callaghan's testimony could not possibly constitute such evidence because she had declined, upon request, to produce her supporting data. See Plaintiff's Motion for Summary Judgment in No. 16-10422 (ED Mich.), Doc. 22, p. 23. But the District Court rejected that argument. See 2017 WL 1173775, *2 (Mar. 30, 2017). And the Court of Appeals for the Sixth Circuit affirmed. See Biestek v. Commissioner of Social Security , 880 F.3d 778 (2017). That court recognized that the Seventh Circuit had adopted the categorical rule Biestek proposed, precluding a vocational expert's testimony from qualifying as substantial if the expert had declined an applicant's request to *1154 provide supporting data. See id. , at 790 (citing McKinnie v. Barnhart , 368 F.3d 907, 910-911 (2004) ). But that rule, the Sixth Circuit observed in joining the ranks of unconvinced courts, "ha[d] not been a popular export." 880 F.3d at 790 (internal quotation marks omitted).
And no more is it so today.
II
The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. T-Mobile South , LLC v. Roswell , 574 U.S. ----, ----, 135 S.Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. Consolidated Edison Co. v. NLRB , 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." Ibid. ; see, e.g. , Perales , 402 U.S. at 401, 91 S.Ct. 1420 (internal quotation marks omitted). It means-and means only-"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison , 305 U.S. at 229, 59 S.Ct. 206. See Dickinson v. Zurko , 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).
Today, Biestek argues that the testimony of a vocational expert who (like O'Callaghan) refuses a request for supporting data about job availability can never clear the substantial-evidence bar. See Brief for Petitioner 21-34. As that formulation makes clear, Biestek's proposed rule is categorical, rendering expert testimony insufficient to sustain an ALJ's factfinding whenever such a refusal has occurred.[1] But Biestek hastens to add two caveats. The first is to clarify what the rule is not, the second to stress where its limits lie.
Biestek initially takes pains-and understandably so-to distinguish his argument from a procedural claim. Reply Brief 12-14. At no stage in this litigation, Biestek says, has he ever espoused "a free-standing procedural rule under which a vocational expert would always have to produce [her underlying data] upon request." Id. , at 2. That kind of rule exists in federal court: There, an expert witness must produce all data she has considered in reaching her conclusions. See Fed. Rule Civ. Proc. 26(a)(2)(B). But as Biestek appreciates, no similar requirement applies in SSA hearings. As explained above, Congress intended those proceedings to be "informal" and provided that the "strict rules of evidence, applicable in the courtroom, *1155 are not to" apply. Perales , 402 U.S. at 400, 91 S.Ct. 1420 ; see 42 U.S.C. § 405(b)(1) ; supra , at 1152. So Biestek does not press for a "procedural rule" governing "the means through which an evidentiary record [must be] created." Tr. of Oral Arg. 6; Reply Brief 13. Instead, he urges a "substantive rule" for "assess[ing] the quality and quantity of [record] evidence"-which would find testimony like O'Callaghan's inadequate, when taken alone, to support an ALJ's factfinding. Id. , at 12.
And Biestek also emphasizes a limitation within that proposed rule. For the rule to kick in, the applicant must make a demand for the expert's supporting data. See Brief for Petitioner i, 5, 18, 40, 55; Tr. of Oral Arg. 25-26. Consider two cases in which vocational experts rely on, but do not produce, nonpublic information. In the first, the applicant asks for the data; in the second, not. According to Biestek, the expert's testimony in the first case cannot possibly clear the substantial-evidence bar; but in the second case, it may well do so, even though the administrative record is otherwise the same. And Biestek underscores that this difference in outcome has nothing to do with waiver or forfeiture: As he acknowledges, an applicant "cannot waive the substantial evidence standard." Id. , at 27. It is just that the evidentiary problem arises from the expert's refusal of a demand, not from the data's absence alone. In his words, the testimony "can constitute substantial evidence if unchallenged, but not if challenged." Reply Brief 18.
To assess Biestek's proposal, we begin with the parties' common ground: Assuming no demand, a vocational expert's testimony may count as substantial evidence even when unaccompanied by supporting data. Take an example. Suppose an expert has top-of-the-line credentials, including professional qualifications and many years' experience; suppose, too, she has a history of giving sound testimony about job availability in similar cases (perhaps before the same ALJ). Now say that she testifies about the approximate number of various sedentary jobs an applicant for benefits could perform. She explains that she arrived at her figures by surveying a range of representative employers; amassing specific information about their labor needs and employment of people with disabilities; and extrapolating those findings to the national economy by means of a well-accepted methodology. She answers cogently and thoroughly all questions put to her by the ALJ and the applicant's lawyer. And nothing in the rest of the record conflicts with anything she says. But she never produces her survey data. Still, her testimony would be the kind of evidence-far "more than a mere scintilla"-that "a reasonable mind might accept as adequate to support" a finding about job availability. Consolidated Edison , 305 U.S. at 229, 59 S.Ct. 206. Of course, the testimony would be even better-more reliable and probative-if she had produced supporting data; that would be a best practice for the SSA and its experts.[2] And of course, a different (maybe less qualified) expert failing to produce such data might offer testimony that is so feeble, or contradicted, that it would fail to clear the substantial-evidence *1156 bar. The point is only-as, again, Biestek accepts-that expert testimony can sometimes surmount that bar absent underlying data.
But if that is true, why should one additional fact-a refusal to a request for that data-make a vocational expert's testimony categorically inadequate? Assume that an applicant challenges our hypothetical expert to turn over her supporting data; and assume the expert declines because the data reveals private information about her clients and making careful redactions will take a fair bit of time. Nothing in the expert's refusal changes her testimony (as described above) about job availability. Nor does it alter any other material in the record. So if our expert's opinion was sufficient-i.e. , qualified as substantial evidence-before the refusal, it is hard to see why the opinion has to be insufficient afterward.
Biestek suggests two reasons for that non-obvious result. First, he contends that the expert's rejection of a request for backup data necessarily "cast[s her testimony] into doubt." Reply Brief 16. And second, he avers that the refusal inevitably "deprives an applicant of the material necessary for an effective cross-examination." Id. , at 2. But Biestek states his arguments too broadly-and the nuggets of truth they contain cannot justify his proposed flat rule.
Consider Biestek's claim about how an expert's refusal undercuts her credibility. Biestek here invokes the established idea of an "adverse inference": If an expert declines to back up her testimony with information in her control, then the factfinder has a reason to think she is hiding something. See id. , at 16 (citing cases). We do not dispute that possibility-but the inference is far from always required. If an ALJ has no other reason to trust the expert, or finds her testimony iffy on its face, her refusal of the applicant's demand for supporting data may properly tip the scales against her opinion. (Indeed, more can be said: Even if the applicant makes no demand, such an expert's withholding of data may count against her.) But if (as in our prior hypothetical example, see supra , at 1154 - 1156) the ALJ views the expert and her testimony as otherwise trustworthy, and thinks she has good reason to keep her data private, her rejection of an applicant's demand need not make a difference. So too when a court reviews the ALJ's decision under the deferential substantial-evidence standard. In some cases, the refusal to disclose data, considered along with other shortcomings, will prevent a court from finding that "a reasonable mind" could accept the expert's testimony. Consolidated Edison , 305 U.S. at 229, 59 S.Ct. 206. But in other cases, that refusal will have no such consequence. Even taking it into account, the expert's opinion will qualify as "more than a mere scintilla" of evidence supporting the ALJ's conclusion. Which is to say it will count, contra Biestek, as substantial.
And much the same is true of Biestek's claim that an expert's refusal precludes meaningful cross-examination. We agree with Biestek that an ALJ and reviewing court may properly consider obstacles to such questioning when deciding how much to credit an expert's opinion. See Perales , 402 U.S. at 402-406, 91 S.Ct. 1420. But Biestek goes too far in suggesting that the refusal to provide supporting data always interferes with effective cross-examination, or that the absence of such testing always requires treating an opinion as unreliable. Even without specific data, an applicant may probe the strength of testimony by asking an expert about (for example) her sources and methods-where she got the information at issue and how she analyzed it and derived her conclusions.
*1157 See, e.g. , Chavez v. Berryhill , 895 F.3d 962, 969-970 (CA7 2018). And even without significant testing, a factfinder may conclude that testimony has sufficient indicia of reliability to support a conclusion about whether an applicant could find work. Indeed, Biestek effectively concedes both those points in cases where supporting data is missing, so long as an expert has not refused an applicant's demand. See supra , at 1154 - 1155. But once that much is acknowledged, Biestek's argument cannot hold. For with or without an express refusal, the absence of data places the selfsame limits on cross-examination.
Where Biestek goes wrong, at bottom, is in pressing for a categorical rule, applying to every case in which a vocational expert refuses a request for underlying data. Sometimes an expert's withholding of such data, when combined with other aspects of the record, will prevent her testimony from qualifying as substantial evidence. That would be so, for example, if the expert has no good reason to keep the data private and her testimony lacks other markers of reliability. But sometimes the reservation of data will have no such effect. Even though the applicant might wish for the data, the expert's testimony still will clear (even handily so) the more-than-a-mere-scintilla threshold. The inquiry, as is usually true in determining the substantiality of evidence, is case-by-case. See, e.g. , Perales , 402 U.S. at 399, 410, 91 S.Ct. 1420 (rejecting a categorical rule pertaining to the substantiality of medical reports in a disability hearing). It takes into account all features of the vocational expert's testimony, as well as the rest of the administrative record. And in so doing, it defers to the presiding ALJ, who has seen the hearing up close.
That much is sufficient to decide this case. Biestek petitioned us only to adopt the categorical rule we have now rejected. He did not ask us to decide whether, in the absence of that rule, substantial evidence supported the ALJ in denying him benefits. Accordingly, we affirm the Court of Appeals' judgment.
It is so ordered.

In contrast, the principal dissent cannot decide whether it favors such a categorical rule. At first, Justice GORSUCH endorses the rule Biestek and the Seventh Circuit have proposed. See post , at 1157. But in then addressing our opinion, he takes little or no issue with the reasoning we offer to show why that rule is too broad. See post , at 1153 - 1155. So the dissent tries to narrow the scope of Biestek's categorical rule-to only cases that look just like his. See post , at 1160 - 1161. And still more, it shelves all the "categorical" talk and concentrates on Biestek's case alone. See post , at 1158, 1160 - 1162. There, Justice GORSUCH's dissent joins Justice SOTOMAYOR's in concluding that the expert evidence in this case was insubstantial. But as we later explain, see infra , at 1157, Biestek did not petition us to resolve that factbound question; nor did his briefing and argument focus on anything other than the Seventh Circuit's categorical rule. We confine our opinion accordingly.

The SSA itself appears to agree. In the handbook given to vocational experts, the agency states: "You should have available, at the hearing, any vocational resource materials that you are likely to rely upon" because "the ALJ may ask you to provide relevant portions of [those] materials." SSA, Vocational Expert Handbook 37 (Aug. 2017), https://www.ssa.gov/appeals/public_experts/Vocational_Experts_ (VE)_Handbook-508.pdf (as last visited Mar. 28, 2019).